THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

Jorge Rivera,
    Plaintiff

v.

Diocese of Venice in Florida, Inc., and St. Catherine Parish in Sebring, Inc.
    Defendant

Case No: _____

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Jorge Rivera, sues Defendants, the Diocese of Venice in Florida, Inc., and St. Catherine Parish in Sebring, Inc., for employment discrimination in the form of a hostile work environment and retaliation following complaints thereof, and states as follows:

COMMON ALLEGATIONS

1. Plaintiff, Jorge Rivera, ("Rivera") is an individual resident of the State of New Jersey.

2. Defendant, Diocese of Venice in Florida, Inc., (the "Diocese"), is a Florida non-profit corporation with its principal place of business in Venice, Florida.

3. Defendant, St. Catherine Parish in Sebring, Inc. (the "Parish"), is a Florida non-profit corporation with its principal place of business in Sebring, Florida.

4. This Court has subject matter jurisdiction over Counts 1 and 2 pursuant to 28 U.S.C. § 1331 because they arise under federal law.

5. This Court has supplemental jurisdiction over Counts 3 and 4 pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims as to form part of the same case or controversy.

6. This Court is the appropriate venue for this proceeding because Plaintiff was employed by Defendant in Highlands County, Florida, and most of the acts giving rise to the Complaint occurred there.

7. Plaintiff is a member of a protected class. He is black. He is also Hispanic and Latino, being of Puerto Rican descent.

8. Plaintiff was hired on or about July 1, 2016, to be the principal of St. Catherine Catholic School (the "School").

9. The School is a private religious school serving grades preschool through eight.

10. The School is located on the campus of St. Catherine Catholic Church in Sebring, Highlands County, Florida (the "Church").

11. Defendant Diocese is a Florida corporation that operates the Roman Catholic schools in a geographical territory that includes Highlands County, Florida, including the School.

12. Defendant Parish is a Florida corporation with its principal place of business in Sebring, Florida.

13. Plaintiff, Principal Rivera, reported to the Superintendent of Catholic Education of the Diocese.

14. However, on a practical, day-to-day basis, he was often subject to supervision by the Priest of the Church, with whom he was required to coordinate and work closely.

15. Both the Diocese and the School, as well as the Parish and the Church, are controlled by the Roman Catholic Church, a vertical, hierarchical religious organization, and are part of its hierarchy.

16. The Defendants have taken various and inconsistent positions on which entity, the Defendant Diocese or the Defendant Parish, employed Principal Rivera.

17. In a contract that Defendants may allege to be applicable, no corporation is named as the employer. Instead, his employer is listed as "Saint Catherine Catholic School… a ministry of the Roman Catholic Diocese of Venice" and is signed by the "Pastor."

18. In a letter from its counsel dated June 10, 2019, the Diocese takes the position that he was employed by the other Defendant, the Parish.

19. However, in documents submitted to the EEOC, the Diocese acknowledged that it employed Rivera.

20. Regardless of Defendants' position, within the meaning of all the statutes under which this Complaint is brought, Principal Rivera was employed jointly by both by the Diocese and the Parish. Both the Diocese and the Parish are operated under the same central, hierarchical authority, and operated for the same purposes. Leaders of both entities exercised control over Principal Rivera and enjoyed the benefit of his services.

21. Prior to being hired, Principal Rivera was living with his family in New Jersey. He moved to Central Florida for the job.

22. St. Catherine Church was, at all relevant times, headed by its priest, Father Jose Gonzalez.

23. Beginning in the 2018-2019 school year, the educational operations of the Defendant Diocese were overseen by its superintendent of schools, Benjamin Moore.

24. At all relevant times, the human resources operations of the Defendant were headed by HR Director Ellen Stein.

25. These three individuals, Fr. Gonzalez, Superintendent Moore, and HR Director Stein, each discriminated against, harassed, and failed to address complaints of harassment as more fully described below.

26. Fr. Gonzalez, Superintendent Moore, and HR Director Stein are all white.

27. In fact, at the time he was hired, Principal Rivera was the only black employee at St. Catherine Church or School.

28. During his tenure, Principal Rivera hired a black teacher, but she was eventually fired by the Diocese without Principal Rivera's knowledge or input.

29. During his entire tenure, Principal Rivera was the only black principal in the entire Diocese of about 16 schools.

30. The racism, discrimination, and harassment of Principal Rivera began almost immediately upon his hiring.

31. For example, during a church service at St. Catherine's shortly after he was hired, Fr. Gonzalez asked Principal Rivera to stand and introduce himself to the

4

congregation. When he was finished, Fr. Gonzalez told the congregation, in a tone that suggested a double meaning, that Principal Rivera would bring "color" to the school. Everyone in the congregation laughed.

32. Principal Rivera was humiliated. In a congregation that was predominantly white, it was obvious that Fr. Gonzalez was referring to the fact that he was of a different race. He was very uncomfortable to be singled out by his race in this way.

33. One day during the 2017-2018 school year, the Bishop of the Diocese was visiting the school. During the visit, the Bishop toured the school with Fr. Gonzalez and Principal Rivera. Principal Rivera casually mentioned a desire to expand the school, and the Bishop was engaged and interested in Principal Rivera's thoughts.

34. Fr. Gonzalez was bothered that Principal Rivera had mentioned his thoughts to the Bishop without going through him, despite the fact that Principal Rivera did not (technically) report to Fr. Gonzalez.

35. Out of earshot of the Bishop, Fr. Gonzalez started singing a song under his breath to Principal Rivera, in Spanish, "Que sera lo que quiere el Negro." The lyrics he sang, translated into English, were "What does the nigger want? What he gets." He sang and spoke the lyric several times to make sure Principal Rivera understood his meaning.

36. Principal Rivera was shocked and humiliated. The context of the song adds even more weight to the egregiousness of the incident.

37. The song, which is well known in some Hispanic cultures, tells the story of a girl asking her mother about a black man. She explains to her mother that when she goes to bed, she covers herself from head to toe, but the black man comes to her and uncovers

5

her. She innocently asks her mother "Mommy, what does the nigger want?" The answer given by the chorus is "What he gets." The implication is sexual.

38. During a staff meeting thereafter, Fr. Gonzalez discussed the Bishop's visit and mentioned that plans to expand the school had been discussed favorably with the Bishop.

39. Then, Fr. Gonzalez sang the excerpt from the song again, in Spanish, in front of Principal Rivera's entire staff.

40. To remove any doubt about the connotation, he sang it again in English, including his translation of the Spanish phrase "el negro" to "the nigger." As Principal Rivera sat there, in the lowest point of his career to date, the priest sang, in English, in front his teachers and admin staff, "What does the nigger want? What he gets."

41. In approximately November 2018, St. Catherine's School participated in a fundraiser selling chocolates. Principal Rivera was standing outside of the school with Fr. Gonzalez waiting for the delivery of chocolates. When the truck arrived, Fr. Gonzalez referred to them verbally as "chocolates for the chocolate principal."

42. Principal Rivera was humiliated and demeaned.

43. In another incident, a parishioner gave St. Catherine Church his collection of ceramic saint figurines. One of them (only one), was black. Fr. Gonzalez gave Principal Rivera that figurine, explaining that he did so because that saint "looks like you".

44. There were other incidents of this nature, and they increased in frequency during the 2018-2019 school year when Superintendent Moore began his first term.

45. Moore would visit St. Catherine much more frequently than the other fifteen schools in the Diocese. He would subject Principal Rivera to additional scrutiny and micromanagement. He would routinely summon Principal Rivera to drive from Sebring to Venice to meet with him, at which time he would present Principal Rivera with a list of falsehoods about his performance shared with him by Fr. Gonzalez.

46. In one meeting in Venice in approximately July 2018, Moore said, "If you don't improve you will not be renewed."

47. But Principal Rivera's performance was exemplary. The previous superintendent used to state that he was a "textbook" principal and a "model" principal. She was honored to have him. He also received two raises during his tenure under her.

48. But by fall 2018, it was becoming increasingly obvious that Principal Rivera's role was being minimized by Father Gonzalez and Superintendent Moore. Matters involving Principal Rivera and his school were routinely discussed and decided on without his involvement by Moore and Gonzalez.

49. In October 2018, one of the school's best teachers, Aretha Jackson-Harris, who is also black, was fired by Ellen Stein, the Diocese's HR director, and Fr. Gonzalez without Principal Rivera's involvement or input.

50. Principal Rivera did not even find out about Ms. Jackson-Harris' termination until after they had fired her.

51. Until Principal Rivera hired her, there were no other black employees at the Church or School except Principal Rivera.

52. Principal Rivera complained to HR about how he was being treated in September or October of 2018.

53. He spoke in person to HR Director Stein. He told her specifically about the "chocolate principal" comment and the singing of the racist song. He met with her in person to discuss these concerns.

54. Nothing was done. In fact, Stein told Principal Rivera "you know how Father [Gonzalez] is" and dismissed the harassment he had experienced without any further action.

55. After that, in retaliation, the Diocese took steps to further minimize Principal Rivera's role and move towards either firing him or making the situation difficult enough for him to resign.

56. In fall 2018, Principal Rivera took some approved leave to address a medical condition.

57. While he was out, Father Gonzalez spread rumors that Principal Rivera would not be returning.

58. After he returned, the school was essentially run without him. Staff members were hired and fired by Moore and Gonzalez without Rivera's knowledge and important meetings, such as crucial budget meetings, were conducted without inviting him.

59. Principal Rivera was profoundly negatively affected by how he was treated. He suffered from, and continues to suffer from, mental health conditions such as depression and anxiety as a direct result of his experience. He could not handle it any

longer, and he feared that, if he were to allow them to fire him, it would adversely impact his future employment options for the rest of his career.

60. Principal Rivera resigned on December 4, 2018.

61. At the time of his resignation, he had no other reasonable options. Any reasonable person would have resigned under the same circumstances.

62. Plaintiff has been discriminated against and harassed because of his race and color, black.

63. Plaintiff has been retaliated against for complaining about the discrimination and harassment.

64. Defendant discriminated and retaliated against Plaintiff with malice and reckless indifference to the rights of Plaintiff.

65. Plaintiff has been damaged by the Defendant's actions. His damages include, but are not limited to, lost wages, emotional distress, and attorneys' fees and costs.

66. Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), charge number 511-2019-02979, on or about May 15, 2019.

67. The charge was dual-filed with the Florida Commission on Human Relations ("FCHR") and processed by the EEOC on behalf of the FCHR pursuant to a work-sharing agreement between the EEOC and the FCHR.

68. The EEOC, acting on behalf of the FCHR, failed to conciliate or determine whether there was reasonable cause for the charge within 180 days of the filing of the charge.

69. The EEOC issued Plaintiff a Notice of Rights attached as Exhibit A.

70. The Notice of Rights is dated August 25, 2020, and was received on a date after August 25, 2020.

71. Plaintiff has retained the undersigned law firm and agreed to pay it a reasonable fee for its services.

### COUNT 1 – TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – HOSTILE WORK ENVIRONMENT

72. This is a cause of action for discrimination (hostile work environment) in violation of Title VII of the Civil Rights Act of 1964.

73. Plaintiff restates the allegations of paragraphs 1 through 71, above.

74. Plaintiff was unlawfully subjected to a hostile work environment because of his race and color, black, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

### COUNT 2 – TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – RETALIATION

75. This is a cause of action for retaliation in violation of Title VII of the Civil Rights Act of 1964 seeking damages in excess of $15,000.

76. Plaintiff restates the allegations of paragraphs 1 through 71, above.

77. Plaintiff's complaint about racial harassment was protected activity pursuant to 42 U.S.C. § 200e-3(a).

78. Defendants unlawfully retaliated against Plaintiff for complaining about harassment by subjecting him to increased scrutiny, minimizing his role, and attempting to

compel him to resign in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).

### Count 4 – Florida Civil Rights Act – Hostile Work Environment

79. This is a cause of action for discrimination (hostile work environment) in violation of the Florida Civil Rights Act.

80. Plaintiff restates the allegations of paragraphs 1 through 71, above.

81. Plaintiff was unlawfully subjected to a hostile work environment because of his race and color, black, in violation of the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq.

### Count 5 – Florida Civil Rights Act – Retaliation

82. This is a cause of action for retaliation in violation of the Florida Civil Rights Act, seeking damages in excess of $15,000.

83. Plaintiff restates the allegations of paragraphs 1 through 71, above.

84. Defendants unlawfully retaliated against Plaintiff for complaining about harassment by subjecting him to increased scrutiny, minimizing his role, and attempting to compel him to resign in violation of the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq.

WHEREFORE, Plaintiff, Jorge Rivera demands a judgment against Defendants and awarding Plaintiff back pay, front pay in lieu of reinstatement (or, in the alternative, reinstatement), compensatory damages, punitive damages, reasonable attorneys' fees and

costs, an injunction prohibiting further discriminatory conduct, and such other relief as the Court may deem appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 23, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the ECF system which will send electronic notification to all participants.

/s/ J. Kemp Brinson
J. Kemp Brinson
Fla. Bar No. 752541
BLOODWORTH LAW, PLLC
801 N. Magnolia Ave. Suite 216
Orlando, FL 32803
407-777-8541
KBrinson@LawyerFightsForYou.com
EO'Malley@LawyerFightsForYou.com
Attorney for Plaintiff